# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

STEVEN CRAIG FULTS,      )
                                )
     Petitioner,           )
                                )     No. 3:09-0507
v.                           )     Chief Judge Haynes
                                )
ERIC QUALLS,[1]          )
                                )
     Respondent.        )

## MEMORANDUM

Petitioner, Steven Craig Fults, a state prisoner, filed this pro se action under 28 U.S.C. § 2254

seeking the writ of habeas corpus to set aside his state convictions of rape, sexual battery by an

authority figure and statutory rape. In earlier proceedings, Respondent filed a motion to dismiss

(Docket Entry No. 7), that the Court denied without prejudice to renew (Docket Entry No. 13). The

Court appointed the Federal Public Defender to represent Petitioner and granted leave to file an

amended petition. After Petitioner filed his amended petition (Docket Entry No. 19), Respondent

renewed his motion to dismiss (Docket Entry No. 24). In light of oral argument in Martinez v. Ryan,

131 S. Ct. 2960 (2011), the Court denied Respondent's renewed motion to dismiss without

prejudice and administratively closed this action until after the decision in Martinez. (Docket Entry

No. 39).

In an earlier Memorandum and Order, the Court also denied Petitioner's motion for

discovery and an evidentiary hearing. (Docket Entry Nos. 36 and 37). The Court found that the

---

[1]Pursuant to Fed. R. Civ. P. 25(d), Jim Morrow, Warden, was substituted as the party defendant for the formerly named Warden, Jim Morrow. (Docket Entry No. 60, Order).

subjects for discovery were known at the time of state proceedings for which Petitioner had ample opportunity under state law to pursue. (Docket Entry No. 36, Court's Memorandum, at 5-6).

After the decision in Martinez, Plaintiff filed his second amended petition[2] (Docket Entry No. 42), with the following claims: (1) ineffective assistance from his trial counsel; (2) that the state prosecutor violated Brady v. Maryland, 373 U.S. 83 (1963); (3) an improper amendment of the underlying indictment; (4) an excessive sentence in violation of the Eighth Amendment; (5) that Petitioner's sentence violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment; (6) prosecutorial misconduct; and (7) a violation of Blakely v. Washington, 542 U.S. 296 (2004). After a review of the second amended petition, the Court set an evidentiary hearing on whether Plaintiff's defaulted claims for his trial counsel's alleged failure to advise him of a guilty plea offer could be considered in light of Martinez. Missouri v. Frye, — U.S. —, 132 S.Ct. 1399 (2012), and Lafler v. Cooper, — U.S. —, 132 S.Ct. 1376 (2012) support this claim

## A. The Martinez Hearing

At that hearing, the Court raised with counsel whether In re Liddell, 722 F.3d 737, 738 (6th Cir. 2013) precluded this claim as a matter of law. There, the Sixth Circuit stated: "as held by every other circuit to consider the issue, neither Frye nor Cooper created a 'new rule of constitutional law' made retroactive to cases on collateral review by the Supreme Court." Id. The Court afforded the parties an opportunity to brief this issue.

---

[2]Rule 15 of the Federal Rules of Civil Procedure applies to a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15 (a), the filing of an amended complaint supersedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the second amended petition to supersede the pro se and first amended petitions. Unless adopted and supported by legal memorandum, the Court deems the claims in the pro se and first amended petition to be waived.

Petitioner contends that the clearly established law provision in Section 2254(d) applies only to the state courts. Petitioner cites <u>Nichols v. Heidle</u>,725 F.3d 516, 557 (6th Cir. 2013) ) for the proposition that "'[c]laims that were not adjudicated on the merits in [s]tate court proceedings receive the pre-AEDPA standard of review: <u>de novo</u> for questions of law (including mixed questions of law and fact), and clear error for questions of fact.' We review this claim <u>de novo</u>.'" (quoting <u>Robinson v. Howes</u>, 663 F.3d 819, 823 (6th Cir.2011) (quotation marks omitted)). Respondent concedes that the Court may consider the guilty plea claim under <u>Martinez</u>, but contends that the guilty plea claim is time barred under the federal habeas statue of limitations.

Although <u>Liddell</u> involved an action under 28 U.S.C. § 2255 that does not contain a requirement of a clearly established right, the Sixth Circuit in <u>Liddell</u> cited for its ruling <u>In re Green</u>, 144 F.3d 384, 388 (6th Cir.1998). <u>Green</u> applied <u>Teague v. Lane</u>, 489 U.S. 288, 305–10 (1989), a ruling in a Section 2254 action. In a word, even without the clearly established law requirement, <u>Liddell</u> holds that the <u>Teague</u> doctrine bars any relief on this type of claim. In this Court's view, the parties' contentions render <u>Liddell</u> a nullity. If the Court conducts an evidentiary hearing and determines that Petitioner has demonstrated cause and prejudice to excuse the procedural default on the guilty plea claim, then the conclusion necessarily follows that Petitioner is entitled to relief on that claim. To award such relief would be contrary to <u>Liddell</u> that is binding on this Court.[3] Thus, the Court concludes that the need for a <u>Martinez</u> hearing is moot because this claim cannot be considered as a matter of law.

Even if the Court is wrong that <u>Liddell</u> controls here, Petitioner's claim about his counsel's alleged omission concerning his guilty plea is timed barred. The Antiterrorism and Effective Death

---

[3] See <u>Reed v. Farley</u>, 512 U.S. 339, 353-54 (1994).

Penalty Act ("AEDPA") that became effective on April 24, 1996, set a one year limitations period for habeas corpus actions. Under 28 U.S.C. § 2244(d)(1), a person convicted in state court has one (1) year from the time the conviction becomes final on direct appeal to file a federal petition. In Lindh v. Murphy, 521 U.S. 32 (1997), the Supreme Court held that the AEDPA was to be applied prospectively, i.e., beginning after April 24, 1996. In Brown v. O'Dea, 187 F.3d 572, 576-77 (6th Cir. 1999), the Sixth Circuit set a one year grace period from the Act's passage, i.e., midnight of April 23, 1997, for the filing of habeas petitions for state prisoners whose convictions were final. Accord Martin v. Jones, 969 F.Supp. 1058, 1061 (M.D. Tenn. 1997). Yet, where a federal habeas action is stayed pending exhaustion of state court remedies, the federal limitations period is tolled. Palmer v. Carlton, 276 F.3d 777, 781 (6th Cir. 2002). Aside from the "stay and abeyance" rule, the federal limitations period can be equitably tolled under the Court's equitable jurisdiction. Souter v. Jones, 395 F.3d 577, 599-600 (6th Cir. 2005).

In addition, under 28 U.S.C. § 2244(d)(2), "the time **during which a properly filed application for State post-conviction** or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitations under this subsection." Id. (emphasis added). "The [statutory] tolling provision does not, however, 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations." Vroman v. Brigano, 346 F.3d 598, 602 (6th Cir. 2003) (quoting Rashid v. Khulmann, 991 F.Supp. 254, 259 (S.D.N.Y.1998)). "[A]n application for post-conviction relief is "properly filed" within the meaning of § 2244(d)(2) "when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for

example, ... the time limits upon its delivery." Id at 603 (quoting Artuz v. Bennett, 531 U.S. 4, 8 (2000).

The pendency of a federal habeas action does not toll the limitation period for filing of a federal habeas claim. Duncan v. Walker, 533 U.S. 167, 181-82 (2001). Under certain conditions, the relation back doctrine under Fed. R. Civ. P. 15(c)(2) can apply in a federal habeas action, but only to the extent that its application does not conflict with the AEDPA limitation period and the challenged claim is tied to the facts alleged in the original petition. Mayle v. Felix, 545 U.S. 644, 649 (2005). As the Supreme Court stated in Mayle:

> An amended habeas petition, we hold, does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.
>
> * * *
>
> Habeas Corpus Rule 11 permits application of the Federal Rules of Civil Procedure in habeas cases "to the extent that [the civil rules] are not inconsistent with any statutory provisions or [the habeas] rules..." Section 2242 specifically provides that habeas applications "may be amended ... as provided in the rules of procedure applicable to civil actions."
>
> * * *
>
> If clams asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance.
>
> * * *
>
> So long as the original and amended petitions state claims that are tied to a common core of operative fats, relation back

Id at 650, 654, 662, 664.

As applied here, there are not any factual allegations in Petitioner's original petition about counsel's failure concerning any guilty plea discussions. Under § 2244(d)(1)(A), Petitioner had one year to file this action Petitioner's state court conviction measured from the date his convictions "became final". Petitioner's convictions became final under Section 2244(d)(1)(A)

5

on February 11, 2007, the conclusion of his direct appeal **and** the expiration of ninety days to seek the writ of certiorari in the United States Supreme Court on direct appeal from his conviction and sentence. See Clay v. United States, 537 U.S. 522, 527-28 (2003).. On April 11, 2007, Petitioner filed his state post-conviction petition with 59 days of federal limitation having passed. (Docket Entry No 10-21 at 4-13). On April 27, 2009, the Tennessee Supreme Court denied Petitioner's application for permission to appeal in his post conviction appeal. On June 5, 2009, Petitioner filed this action with a total of 98 days of the federal habeas limitation period having passed. The federal habeas statute of limitations would have expired on March 4, 2010. Although this action is timely, Petitioner's original petition lacks any factual allegations concerning his trial counsel's failure to advise him properly about the State's plea offer. Petitioner first asserted this claim in his second amended petition for writ of habeas corpus that was filed on March 21, 2013, three years beyond the federal habeas statute. Thus, the Court concludes that this claim is also time barred and the need for a Martinez hearing remains moot.

### B. Analysis of the Remaining Claims

Before the Court is the Respondent renewed his motion to dismiss (Docket Entry No. 45), contending, in sum, that the state courts reasonably applied clearly established federal law to Plaintiff's exhausted claims and that several of Plaintiff's claims are procedurally defaulted without a showing of cause and prejudice. The parties have filed memoranda on the merits of their respective claims and defenses.(Docket Entry Nos. 46, 53, 61, and 64).

After a review of the State court record and the parties' submissions, set forth below are the Court's findings and conclusions of law that the Respondent's motion to dismiss should be granted and the petition for the writ should be denied.

## 1. Procedural History

On November 14, 2003,[4] a jury convicted Petitioner of five counts of rape, twelve counts of sexual battery by an authority figure and seven counts of statutory rape for which he received an effective sentence of forty-five years. State v. Fults, No. M2004-02092-CCA-R3-CD, 2006 WL 1896356, at *1 (Tenn. Ct. Crim. App. July 7, 2006). On appeal, the Tennessee Court of Criminal Appeals merged Petitioner's three sexual battery by an authority figure convictions with Petitioner's three rape convictions and merged Petitioners' seven statutory rape convictions into Petitioner's seven convictions for sexual battery by an authority figure. Id. Yet, Petitioner's effective sentence remained forty-five years. Id. On November 13, 2006, the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id. at *1.

Petitioner then filed a pro se post-conviction petition and the state trial court appointed counsel for Petitioner. After an evidentiary hearing, the state trial court denied that petition. (Docket Entry No. 10-21 at 25-30). On November 5, 2007, Petitioner filed a motion to reopen that action, id. at 33-41, but the trial court again denied relief. Id. at 42-44. On appeal, the Tennessee Court of Criminal Appeals affirmed the trial court's orders. Fults v. State, No. M2007-02570-CCA-R3-PC, 2009 WL 311461 (Tenn. Ct. Crim. App. Jan. 9, 2009). On April 27, 2009, the Tennessee Supreme Court denied permission to appeal. Id.

## 2. Review of the State Record

In Petitioner's direct appeal, the Tennessee Court of Criminal Appeals set forth extensive

---

[4] See Docket Entry No. 10-1 at 2.

findings of the facts[5] underlying Petitioner's convictions:

> The victim in this case, a minor, will be referred to by his initials. M.D. testified that he was born in 1986 and was seventeen years old at the time of the trial. He attended Barfield Elementary School in Rutherford County, where Defendant taught seventh grade social studies. M.D. said his home room was across from Defendant's classroom, and he saw Defendant every day around the school. Defendant let the students, including M.D., play with his collection of beanie babies and use the computer in his classroom.
>
> M.D. said that he graduated from Barfield Elementary School in May 2000, and entered Riverdale High School in Rutherford County that fall. M.D. said that after he started high school, Defendant contacted him "out of the blue." Defendant asked M.D. if he wanted to work for him as an assistant for the Barfield Elementary School's soccer team, which Defendant coached, and to help Defendant in his classroom. Defendant asked M.D.'s mother, Linda Devine, if her son could work for him, and Ms. Devine agreed. M.D. began working for Defendant two or three times a week, including Saturday when the soccer games were played. Defendant often picked M.D. up at his house when M.D. was scheduled to work for Defendant at the school or at a soccer game. M.D. said Defendant paid him "a lot," sometimes as much as $50.00 to $70.00 for an afternoon of work. M.D. said that he and Defendant spent part of his working time talking about what was going on in M.D.'s life, including M.D.'s feelings about his father and his concerns about fitting into high school. These conversations took place in Defendant's classroom after school was dismissed for the day. M.D. worked for Defendant about one year during which time no inappropriate conduct occurred.
>
> One afternoon after they had attended a soccer game during M.D.'s sophomore year in the fall of 2001, Defendant told M.D. that he needed to drop some equipment off in the classroom. M.D. carried a black bag into the school, and some items in the bag clattered when he set the bag on the floor. M.D. testified that it sounded like video tapes. Defendant asked M.D. to straighten up the classroom. While M.D.'s back was turned, Defendant put a "dirty movie" in the VCR which depicted a man and woman engaging in sexual acts. Defendant asked M.D. what he thought about the movie, and M.D. said that he "started getting really freaked out." Defendant started rubbing M.D.'s back. Defendant touched M.D.'s penis over his clothes and then unzipped his pants and performed fellatio on M.D. M.D. said that he did not do anything to stop Defendant, stating "I didn't

---

[5]State appellate court opinion findings can constitute factual findings in a habeas action, Sumner v. Mata, 449 U.S. 539, 546-47 (1981), and have a statutory presumption of correctness. 28 U.S.C. § 2254(e).

8

know what to do. I just stood there because I didn't know what to think and I was scared." M.D. said that Defendant started moaning "like he really liked it and started calling me, like, going oh baby, and things like that."

M.D. testified:

> [Defendant] just told me not to say anything and what it would do to me and people would think about me if they found out that I was doing these kind of things. And how they'd call me gay and [Defendant told] me all the people that he knew and would always tell me like stories about how he could get people in trouble.... [Defendant] took me home, I didn't talk to my mom, I went in the bathroom, and I threw up and my mom asked me what was wrong, and I just said it [was] something I ate. And I just stood in the shower because I felt dirty. Because that was the first time anything ever happened like that at all. I just stood in the shower and that was it. And I just went to bed because I just felt ashamed and embarrassed.

M.D. said that he trusted Defendant and looked up to him. Defendant told him "all the time" that he would take care of M.D. and that M.D. should look to him as his father because Defendant had never had a son.

On a second occasion in Defendant's classroom, Defendant played a video tape of two men engaging in sexual activities. M.D. turned the recorder off because it "grossed him out." Defendant told M.D., "you know, it's not gay, ... you need it just when you need it." M.D. did not remember any sexual contact on this occasion.

M.D. said one sexual encounter occurred near Halloween. M.D. said that he was dating a girl from Riverdale High School, and he wanted to buy her a gift for her birthday on November 4, 2001. Defendant told M.D. that he could earn some money by cleaning Defendant's classroom. Defendant stopped M.D. while he was working and performed fellatio on him. Defendant again told M.D. not to tell anyone. Defendant warned M.D. that they "had already done it so who could [M.D.] tell without people thinking that [he] was gay." M.D. said that he was scared "and just whenever [Defendant] pretty much wanted to do it [M.D.] let him." M.D. testified that his reputation was very important to him.

M.D. described three separate occasions which involved Defendant performing fellatio on him in the classroom around the holidays of Valentine's Day, Easter, and Christmas; in the elementary school's locker room; and in Defendant's car in Barfield Park after M.D. got his learner's permit to drive. M.D. said Defendant

9

began coming to his house in the morning after his mother left for work. M.D. described three separate sexual encounters which occurred in his bedroom, in the kitchen, and in the living room. M.D. said that Defendant always touched other parts of his body, such as his legs, buttocks, and chest, while he engaged in oral sex. M.D. said that Defendant performed fellatio on him over one hundred times in Defendant's classroom, and twenty-five to thirty times in M.D.'s house. M.D. said that "[i]t became so often, it was like a routine." M.D. testified that Defendant performed oral sex on him about three times a week from sometime in the fall of 2001 until sometime in early 2003.

M.D. said that he was too embarrassed to tell his mother about the encounters. He acknowledged that Defendant gave him money, clothes, and a phone card. Defendant started doing M.D.'s homework for him. M.D. saved $2,000, and Defendant found him a car to purchase.

M.D. said that he finally "forged up enough courage" and told Defendant he "didn't want to do anything" anymore, and Defendant refrained from sexual contact for four or five months. At some point, Defendant told M.D. that he wanted to marry him and take care of him. Defendant said that M.D. "wouldn't have to worry about anything." M.D. told Defendant that he "couldn't see him that way," and Defendant cried.

Fults, 2006 WL 1896356 at * 1-3. The state court's other factual findings are set forth in the

context of Petitioner's specific claims.

## C. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997).

Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their

merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412. In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "'state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.'" Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998)

(quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).The Supreme Court reiterated that "we have made clear that whether state court decision was unreasonable must be assessed **in light of the record the court had before it**". Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added).

In Greene v. Fisher, —— U.S. ——, 132 S.Ct. 38, 42 (2011), the Supreme Court considered whether "'clearly established Federal law' includes decisions of th[e] [Supreme] Court that are announced after the last adjudications of the merits in state court but before the defendant's conviction becomes final" and answered the question in the affirmative. There, a Supreme Court decision at issue was rendered two months after the state supreme court upheld the petitioner's convictions. Id. at 43. The Supreme Court held that its decision was not clearly established at the time of the state supreme court's decision. Id. at 44-45. The Supreme Court noted a different result if the petitioner had applied for the writ of certiorari or had filed a state post-conviction petition. Id. at 45.

The district court also "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

### 1. Petitioner's Exhausted Claims

### a. Petitioner's Ineffective Assistance of Counsel Claims

In his second amended petition, Petitioner asserts several distinct ineffective assistance of trial counsel claims:

12

(1)     [t]rial counsel failed to adequately investigate, or present evidence of, the victim's efforts to contact and threaten Petitioner after a "No Contact" order, including the victim's offer to drop all charges if Petitioner signed a car title to him.

(2)     [t]rial counsel failed to adequately investigate, or present evidence of, the victim's (and his parent[s']) plan to pursue a civil lawsuit against Petitioner and the Rutherford County School District.

(3)     [t]rial counsel failed to adequately investigate, or present testimony from[] impeachment witnesses such as Barclay Hutton, who could have testified about the alleged victim's dishonesty and manipulative behavior.

(4)     [t]rial counsel failed to investigate, present evidence of, or advise Petitioner of the potential impeachment value of any compensation received by the victim and his family under the Criminal Injuries Compensation Act.

(5)     [t]rial counsel failed to develop or present numerous character witnesses who could have testified persuasively on Petitioner's behalf. These witnesses included a former student of Petitioner's who had become a highway patrolman.

(6)     [t]rial counsel failed to adequately investigate, or present evidence of, the alleged victim's school disciplinary records, which documented incidents of sexual misconduct involving homosexual behavior[.]

(7)     [t]rial counsel failed to inquire adequately into the results of the investigation conducted by Harold Pendegraph, a private investigator hired by Petitioner's family. Trial counsel likewise failed to call Pendegraph as a witness at trial, or introduce any of the witnesses or evidence uncovered by Pendegraph.

(8)     [t]rial counsel failed to move for a change of venue despite extensive pre-trial publicity.

(9)     [t]rial counsel failed to raise a Sixth Amendment challenge to Petitioner's sentence, under Blakely v. Washington, 542 U.S. 296 (2004), on direct appeal, although Blakely was pending before the Supreme Court and then decided during the course of [Petitioner's] direct appeal.

(10)     [t]rial counsel failed to properly advise Petitioner regarding the plea offer extended by the State. Specifically, counsel failed to adequately explain Petitioner's comparative sentencing exposure with and without a jury finding that he employed force and was thus guilty of rape, failed to explain the near certainty of conviction on the sexual battery by an authority figure and statutory rape

counts, failed to explain that Petitioner's sentencing exposure on the sexual battery and statutory rape counts alone well exceeded the prosecution's plea bargain offer, and/or failed to properly advise Petitioner on whether to accept the prosecution's plea offer of less than 10 years.

(Docket Entry No. 42 at 8-10).

As to these claims, Respondent concedes that Petitioner presented the following claims about his counsel to the state courts: (1) counsel's failure to present evidence of the victim's violation of the no contact order; (2) counsel's failure to present evidence of the victim's civil action and victim's claims under the Tennessee Criminal Injuries Compensation Act ("CICA"), Tenn. Code Ann. § 29-13-101 et seq.;(3) counsel's failure to call character witnesses; (4) counsel's failure to utilize the victim's school disciplinary records; and (5) counsel's failure to use the Pendergraph investigation. Respondent contends Petitioner's claims about his counsel's alleged failures concerning the car title, venue, Blakely and the plea offer were not presented to the state courts and are procedurally defaulted without any showing of cause or prejudice. The Court considers first Petitioner's undisputed exhausted claims about his trial counsel.

### b. The Victim's Violation of the No Contact Order

For this claim in the state post conviction proceeding, Petitioner testified that victim contacted him and threatened him, but his trial counsel did not pursue that evidence at trial:

This happened on a couple of occasions. The first one occurred late one night while I was on my way home from work. I was working in Cookeville at the time at a factory. And my cell phone rang. And the alleged victim in the case came to the telephone and threatened me.

(Docket Entry No. 10-22 Post Conviction Hearing Transcript at 10). Guy Dotson, Petitioner's trial attorney, was aware of these contacts, but did not consider the incidents helpful because the defense theory was that the victim consented to the sexual conduct with Petitioner. Dotson

14

testified as follows:

> Q.     Now, you have heard Mr. Fults testify. And in regard to the allegation that the victim in this case threatened Mr. Fults, do you recall that?
>
> A.     I recall Mr. Fults contacting me about that. And I advised him to contact the authorities and make a complaint about that if, in fact, it happened.
>
> Q.     Okay, sir. And were you able to bring forth - or did Mr. Fults present you with any proof other than him saying that it happened that it actually had, in fact, happened?
>
> A.     No, sir. He called and told me that it happened. And I told him who he needed to contact and told him about venue.
>
> Q.     And to your knowledge was a juvenile petition issued?
>
> A.     I have no - I do not know either way.
>
> Q.     **In the event that Mr. - the victim in this case had been found to have threatened Mr. Fults, would you have used that at trial**?
>
> A.     **I probably would not have used that at trial**.
>
> Q.     **And tell us why, please, sir**.
>
> A.     **The child's reaction to Mr. Fults' actions against him could have been violent. I felt most of that was going to assist the State's case more than Mr. Fults' case in that it had all come to light, and he was just acting out on some of his anger**.
>
> Q.     Okay. So, you - if I understood your answer, you had no solid proof that it happened. But if it had, strategically you felt like it would - -or it could be beneficial to the State?
>
> A. Yes. Strategically I thought it would hurt our case.

Id. at 19-20 (emphasis added).

The state trial court deemed Dotson's decision about these incidents to be "a strategic decision," (Docket Entry No. 10-21, at 27). On appeal, the Tennessee Court of Criminal

Appeals also characterized this claim as a strategic decision of trial counsel that did not prejudice Petitioner:

> [The petitioner] first contends that trial counsel was ineffective for not bringing a threat by the victim to the attention of the trial court. . . . **However, he does not provide any evidence of how he was prejudiced by trial counsel's strategy**. As previously stated, in order to succeed in a post-conviction petition, the petitioner must prove both that counsel's performance was deficient and that the deficient performance resulted in prejudice to the petitioner. **The petitioner is essentially arguing that counsel's strategy was ineffective. However, the petitioner is not entitled to the benefit of hindsight and may not second-guess a reasonably based trial strategy by counsel. . . . Further, the petitioner has not established any resultant prejudice from trial counsel's strategy and, therefore, is not entitled to relief on this issue.**

Fults, 2009 WL 311461 at *7 (emphasis added).

To establish ineffective assistance of counsel, Petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). As the Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

16

These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id at 690-91.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691. Counsel's failure "'to conduct []

constitutionally adequate pretrial investigation into potential mitigation evidence" can "hamper[]
[their] ability to make strategic choices.'" Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005)
(citation omitted). A court must examine not only the individual errors of counsel, but must also
view the effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, No. 98-1616,
2000WL712376, at *4 (6th Cir. May 23, 2000).

To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a
reasonable probability "'that, but for counsel's unprofessional errors, the result of the proceeding
would have been different. A reasonable probability is a probability sufficient to undermine
confidence in the outcome.'" Williams, 529 U.S. at 390-91 (citations omitted). In a word, "[t]he
result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if
the errors of counsel cannot be shown by a preponderance of the evidence to have determined the
outcome." Strickland, 466 U.S. at 694.

Here, based on Petitioner's trial counsel's testimony, the state courts could reasonably
conclude that trial counsel's decision not to explore the victim's alleged threats at trial, involved
a strategic decision of counsel that was not prejudicial to the Petitioner. The undisputed fact is
that the defense theory at trial was consent. Although Petitioner argues now the loss of the
opportunity to show bias of the victim with the threats, Petitioner's trial counsel considered those
threats and elected the consent theory for his defense. To pursue such proof in trial counsel's
opinion would be contrary to that defense. Given the deference required by Strickland to strategic
decisions of trial counsel, the Court concludes that the state courts' decisions on this claim were
reasonable applications of Strickland and this claim lacks merit.

### c. The Victim's Civil Action and Compensation Claims

For these two claims, Petitioner asserts that "[t]rial counsel failed to adequately investigate, or present evidence of, the victim's (and his parent[s']) plan to pursue a civil lawsuit against Petitioner and the Rutherford County School District." (Docket Entry No. 42, Second Amended Petition at 8). Petitioner's related claim is that "[t]rial counsel failed to investigate, present evidence of, or advise Petitioner of the potential impeachment value of any compensation received by the victim and his family under the Criminal Injuries Compensation Act" ("CICA"). Id.

At the state post-conviction hearing, Petitioner did not testify that he learned of a civil action against him and the Rutherford County Schools before or during his trial in November 2003: "I don't know if they had filed that before I was found guilty or shortly thereafter. I really don't know." (Docket Entry No. 10-22 Post Conviction Hearing Transcript at 12-14). At some point, Petitioner informed his attorney about that action. Id. at 13. Yet, Petitioner did not testify that prior to his trial he discussed with his counsel the victim's family's civil action. According to Guy Dotson, Petitioner's trial counsel, the civil action would be relevant as evidence of bias, but inconsistent with the defense strategy of consent.

> Q. Now, it is important whether or not the victim in a criminal case has a financial interest in the outcome?
>
> A. Yes.
>
> Q. That's bias. And we have been impeaching people with that, you and I for - ever since we have been practicing, haven't we?
>
> A. Yes, sir.
>
> Q. If the Devines were planning a lawsuit against Mr. Fults, would that be

important to ask them about?

A.    Yes, sir.

Q.    And if the Devines were planning a criminal injuries compensation act claim against Mr. Fults, would that also be important to ask them about?

A.    Yes, sir.

Id. at 27-28. Yet, Dotson was not questioned if he knew of the victim's civil action or CICA claim prior to Petitioner's trial. Dotson explained that "[t]he defense strategy at trial was basically consent. That the boy entered into a consensual relationship with [Petitioner]."Id. at 23. This defense was undermined at the trial when after cross examination of the two defense witnesses, Petitioner "decided he did not want to testify." Id.

The Tennessee Court of Criminal Appeals addressed this claim and did not discern any prejudice to Petitioner: "Here, the petitioner contends that . . . counsel should have impeached the victim with evidence that he planned to initiate a civil lawsuit. He also argues that counsel was ineffective for not investigating the threat made by the victim. However, he does not provide any evidence of how he was prejudiced by trial counsel's strategy.Fults, 2009 WL 311461 at *7. The Court of Criminal Appeals likewise found that Petitioner "is essentially arguing that counsel's strategy was ineffective. However, the petitioner is not entitled to the benefit of hindsight and may not second-guess a reasonably based trial strategy by counsel." Id.

Again, given Strickland's deference to trial counsel on defense theories and the lack of proof that a civil or administrative action were pursued prior to or during his trial, this Court concludes that the state courts reasonably applied federal law to rule that these alleged omissions of counsel were not prejudicial.

#### d.  Character Witnesses and Private Investigation Claims

Petitioner's next claims are that "[t]rial counsel failed to develop or present numerous

character witnesses who could have testified persuasively on Petitioner's behalf. These witnesses

included a former student of Petitioner's who had become a highway patrolman." (Docket Entry

No. 42 at 8).  Petitioner also cites his counsel's failure to use the fruits of an investigator who

was hired by his family.  For this claim, Petitioner testified at the state post-conviction hearing as

follows:

> Q.  Now, did you have character witnesses that you wanted to call on your behalf?
>
> A.  Yes.
>
> Q.  And did you tell Mr. Dotson about that?
>
> A.  I gave him a list of several people that could have been called in regards to the case, yes.
>
> Q.  And who were the character witnesses?
>
> A.  I spoke to him about two different ones that were former students that went on to become Tennessee Highway Patrolmen.
>
> Q.  And who were they?
>
> A.  Donnie Clark was one. And he went on to become a Highway Patrolman. And there was another one who went on - and he was serving in Iraq.

(Docket Entry No. 10-22, Post Conviction Hearing Transcript  at 16). Yet, the cited witnesses did

not testify at the post-conviction hearing. According to Dotson, Petitioner's family hired an

investigator who "primarily talked to people about post actions after the alleged incidents

occurred, what happened afterwards. And that was not going to help us at the trial." (Docket

Entry No. 10-22 at 22-23).

The state post-conviction trial court rejected this claim as a strategic decision of counsel on which witness to call at trial:

> [Petitioner] presented proof about the failure of Mr. Dotson to call the private detective hired by the [Petitioner's] family, as well as, any character witnesses. Mr. Dotson explained the private investigator focused his work on events after the alleged criminal activity. The decision not to call character witnesses was a strategic one.

(Docket Entry No. 10-21 at 28).

On his post-conviction appeal, Petitioner's entire argument on these omissions was the following:

> The Petitioner has no criminal record prior to these events and certainly enjoyed reputation of good character in the community. His trial counsel was ineffective for not producing said witnesses to testify about his good character. He was certainly prejudiced by the failure to call those witnesses because good character in itself can create reasonable doubt.

Fults, 2009 WL 311461 at *7. The Tennessee appellate court ruled that: "the petitioner's argument contains no citation to authority and no support for his argument. This issue is waived. Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997)." Id.

In his response to Respondent's motion to dismiss, Petitioner does not address this claim. Given the state record, the Court deems the state courts' decisions on these claims to be a reasonable decisions based upon the lack of proof of actual prejudice required by Strickland.

### e. The Victim's Disciplinary Records

Petitioner's next claim is that his trial counsel was deficient in that "[t]rial counsel failed to adequately investigate, or present evidence of, the alleged victim's school disciplinary records,

which documented incidents of sexual misconduct involving homosexual behavior[.]" (Docket Entry No. 42, Second Amended Petition at 8). According to Petitioner, the victim's school records reveal the victim's engagement in sexual misconduct of a homosexual nature and proof of such incidents would have completely discredited the victim's testimony that he feared being exposed or misidentified as a homosexual.

At the state post-conviction hearing, Petitioner described several instances of the victim's misconduct at Barfield Elementary School as "involving other men." (Docket Entry No. 10-22 Post Conviction Hearing Transcript at 12). Petitioner described the actual nature of the victim's alleged conduct:

> Q.    Now, in that regard, have you discovered or did you know at the time that the victim had been in some disciplinary trouble at school regarding homosexual behavior?
>
> A.    Yes.
>
> Q.    And what was the nature of that behavior?
>
> A.    I learned through his disciplinary records when he was at Barfield, he had been called into the office on numerous occasions. And all of those were of a sexual nature involving other men.
>
> Q.    Okay. Did some involve taking another boy's pants down?
>
> A.    Pulling down somebody's pants, making vulgar and lewd comments, mentioning homosexuality in the classroom, calling other teachers queer or derogatory names, along that line of things.

Id. at 12.

Dotson did not recall any homosexual acts by the victim, but admitted Petitioner told him of the victim's disciplinary history at school. Dotson explained that the victim's disciplinary conduct led to the victim's placement in Petitioner's supervision:

23

> I do not recall him bringing that [the victim had been disciplined at school for homosexual acts] to my attention. I do -- I remember that he stated that he had disciplinary problems at school. And part of those disciplinary problems led to the reason why [Petitioner] allowed [the victim] to do some extra studies in his class. I think [Petitioner] conducted an afternoon study class or something, would allow students to come in there. And [the victim] had participated some in that.

Id. at 20-21. In Dotson's view, proof of the victim's disciplinary record related to alleged sexual conduct that would have been harmful to the defense's theory of consent and could cast Petitioner as a sexual predator who identified and seduced a vulnerable young man with some homosexual tendencies.

> Q.    If the - [victim's] disciplinary records at the school indicated that a report was filed and you were told about this that said, in this class [the victim] exposed himself to Brandon Berry. Brandon said [the victim] was saying nasty stuff to Brandon. He was touching himself, and then trying to touch Brandon. He then exposed himself to Brandon. Wouldn't that be relevant to ask [the victim] about in a consent case?

> A.    In this particular case I do not think that it would. And the reason being, if [Petitioner] had knowledge of that, and apparently he did through Barfield, he would have known who to go after if he was going to make his move on [the victim].

(Docket Entry No. 10-22 at 25). Dotson's defense strategy was based upon the victim's consent to the sexual acts with the Petitioner. Id. at 23. This proof of how the victim was assigned to the Petitioner's supervision would not be beneficial to the defense theory of consent. Id. at 20-21. Dotson testified that Petitioner was going to be the defense's primary witness at trial, but after the state's cross examination of two defenses witnesses, Petitioner elected not to testify. Id. at 23-24.

The Tennessee Court of Criminal Appeals ruled this claim to involve trial counsel's strategic decisions:

In his final issue, the petitioner argues that counsel was ineffective for failing to introduce the victim's school disciplinary records dealing with sexual misconduct relating to homosexuality. The petitioner argues that because the defense was consent to the sexual conduct that records pertaining to the victim's own homosexuality, occurring two years prior to the petitioner's conduct, should have been presented. **Trial counsel testified that he was not aware that the victim had been in trouble at school for homosexual behavior. He also said that he would not have used the information at trial because it could have depicted the petitioner as a predator who picked the victim as his target because of the petitioner's knowledge that the victim had engaged in homosexual activity. Again, this is an issue of trial strategy that appears reasonably based. The fact that a particular strategy or tactic hurt the defense does not, alone, support a claim of ineffective assistance. . . . Here, the petitioner has not demonstrated that the failure to introduce this evidence resulted in prejudice.** Therefore, we affirm the judgment from the post-conviction court.

Fults, 2009 WL 311461 at *8 (emphasis added with citation omitted).

Again the state courts' findings of defense counsel's strategic decision to pursue a consent defense provides a rational basis for their decision and the state courts reasonably applied federal law to this claim.

### f. Counsel's Failure to Raise a Blakely Claim

This claim cites the trial court's reliance on enhancements in sentencing Petitioner. (Docket Entry No. 10-9 at 153-167). Although the sentencing ranges were 8 to 12 months, the state trial court sentenced Petitioner to nine years sentence on each rape conviction to be consecutive and the other sentences concurrent. Under Tennessee law, "[a]bsent enhancing or mitigating factors, the presumptive sentence for a Class B, C. D, and E felonies was the minimum in the applicable range" Gomez II, 239 S.W.3d at 739; Tenn. Code Ann. §40-35-210(c). As applied here, Petitioner's qualifying felonies yielded a sentencing range of 8 to 12 years. The state trial court applied the following four enhancement factors in Tenn. Code Ann. § 40-35-114(5), (8), (16), (18) (2003) that raised Petitioner's sentence to one year beyond the

minimum sentence to Petitioner's sentence for each rape conviction:

At the time of Petitioner's trial on April 15, 2005, the Tennessee Supreme Court had held in State v. Gomez, 163 S.W.3d 632, 661 (Tenn. 2005), that Tennessee sentencing scheme did not violate Blakely. ("Gomez I"). After Cunningham v. California, 549 U.S. 270 (2007), Gomez was vacated and remanded. Gomez v. Tennessee, 549 U.S. 1190 (2007). After remand, on January 22, 2007, the Tennessee Supreme Court held that the Tennessee's judge-determined enhancement factors violated the United States Constitution. Gomez II, 239 S.W.3d at 739-41. Gomez II was decided on October 9, 2007.

On November 5, 2007, Petitioner moved to reopen his earlier post-conviction petition, asserting that he "was denied the effective assistance of counsel and his rights of due process by the Court enhancing and running consecutive sentences based on evidence not found by a jury beyond a reasonable doubt. Blakely v. Washington, 124 S. Ct. 1493, 158 L.Ed.2d 75 (Feb. 23, 2004)." (Docket Entry No. 10-21 at 34). Petitioner also cited Gomez II as "a final ruling establishing a constitutional right that was not recognized as existing at the time of trial but now is required to be recognized and applied in [his] case." Id. at 37. Petitioner asserted:

> Each of the Petitioner's rape convictions in this case was enhanced from an eight year sentence to a nine year sentence without any facts being found by the jury. For that reason, this Motion to Reopen should be granted, and the Court should reduce the Petitioners sentence from 45 years to 40 years.

Id. at 41. Petitioner argued that his trial counsel was ineffective for not raising the "Gomez issue since Apprendi and Blakely had been decided by the time of his trial and direct appeal." Id. The post-conviction court considered Petitioner's claim, but denied relief, concluding that Gomez II was held not to retroactive. Id. at 42-44. In his appellate brief, Petitioner described the issue

about his counsel's failure to raise <u>Blakely</u> issues as follows:

> Petitioner was denied the effective assistance of counsel, his right to a jury trial beyond a reasonable doubt and his right to due process for finding beyond a reasonable doubt by the Court enhancing and running his sentences consecutively based on evidence not found by the jury beyond a reasonable doubt. <u>Blakely v. Washington</u>, 124 S. Ct. 1493, 158 L.Ed.2d 75 (2004); <u>State v. Gomez II</u>, ___ S.W. 3d ___ (2007), 2007 WL 2917726, Tennessee October 9, 2007 (No. M2002-01209-SC-R11-CD)

(Docket Entry No. 10-24 at 9). Petitioner argued:

> There is no question now after <u>Gomez II</u> that <u>Blakely</u> applied to the Tennessee sentencing scheme at the time of this trial and sentencing. The Petitioner's case was in the pipeline when <u>Blakely</u> was announced. Under a plenary review, therefore, he would be entitled to have his sentences remanded for resentencing and reduced to the minimum punishment on each since he has no prior criminal record. That would change his effective sentence from 45 years to 40 years. Also in the pipeline at this time are cases before the Tennessee Supreme Court on the issue on whether consecutive sentencing must be done in connection with <u>Blakely</u>. If they so hold, the defendant would reap the benefit of that decision as well.

<u>Id</u>.

In denying Petitioner's ineffective assistance of counsel claim based upon <u>Blakely</u>, the

Tennessee Court of Criminal Appeals reasoned:

> In his first issue, the petitioner argues that because his case was in the "pipeline" prior to <u>Blakely v. Washington</u>, 524 U.S. 296, 124 S.Ct. 1493, 158 L.Ed.2d 75 (2004), he is automatically entitled to a remand for re-sentencing. This court's decision on direct appeal addressed the propriety of consecutive sentencing and concluded that the imposition of consecutive sentencing under Tennessee Code Annotated section 40–35–115(b)(5) was appropriate. <u>State v. Steven Craig Fults</u>, No. M2004–CCA–R3–CD, 2006 Tenn.Crim.App. LEXIS 520, at *49 (Tenn.Crim.App. July 7, 2006).

> A recent decision of our court contained this note:

>> We note that our supreme court's recent decision in <u>State v. Gomez</u>, 239 S.W.3d 733, 740 (Tenn.2007), in which the supreme court determined that the use of enhancement factors not found by

27

a jury or admitted by a defendant violated the Sixth Amendment, does not affect our review of consecutive sentencing issues. Before our supreme court's decision in Gomez, it had specifically noted that Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), did not impact Tennessee's consecutive sentencing scheme. State v. Robinson, 146 S.W.3d 469, 499 n. 14 (Tenn.2004). In addition, this court has consistently found that Blakely does not affect consecutive sentencing determinations. See State v. Earice Roberts, No. W2003–02668–CCA–R3–CD, 2004 Tenn.Crim.App. LEXIS 1049, 2004 WL 2715316, at *15 (Tenn.Crim.App., at Jackson, Nov. 23, 2004), perm. app. denied (Tenn. Mar. 21, 2005); State v. Laurence Warren Pierce, No. M2003–01924–CCA–R3–CD, 2004 Tenn.Crim.App. LEXIS 994, 2004 WL 2533794, at *16 (Tenn.Crim.App., at Nashville, Nov. 9, 2004), perm. app. denied (Tenn. Feb. 28, 2005).

State v. David Harold Hammond, No. W2007–00219–CCA–R3–CD, 2008 Tenn.Crim.App. LEXIS 100, *9–10, (Tenn.Crim.App. Feb 21, 2008), perm. app. denied (Tenn. Aug. 25, 2008). Therefore, because Blakely and its progeny do not affect consecutive sentencing, we conclude that the petitioner is not entitled to any relief on this issue. See State v. Allen, 259 S.W.3d 671 (Tenn.2008).

Fults, 2009 WL 311461, at *5.

As stated earlier, Petitioner must show that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." Williams, 529 U.S. at 413.

"A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a

petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." Caspari v. Bohlen, 510 U.S. 383, 390 (1994). Petitioner's direct appeal was denied on July 7, 2006, and the Tennessee Supreme Court denied his application for permission to appeal on direct review on November 13, 2006, prior to the Cunningham decision on January 22, 2007. Yet, Petitioner had ninety days to pursue a petition for the writ of certiorari with the Supreme Court or February 12, 2007, three weeks after Cunningham was decided. Id. at 390-91; Rule 13 of the Supreme Court ("Unless otherwise provided by law, a petition for a writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort or a United States court of appeals (including the United States Court of Appeals for the Armed Forces) is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment."); Lovins v. Parker, 712 F.3d 283, 298 (6th Cir. 2013).

The Court concludes, however, that Petitioner's claim about his counsel's failure to raise a Blakely claim lacks merit. Cunningham, the triggering decision, was rendered  after Petitioner's direct appeal. Petitioner successfully moved to reopen his state post-conviction proceeding and Petitioner was able to assert his Blakely claims. In this context, the Court does not discern any ineffectiveness of counsel.  In any event, Petitioner has not shown prejudice based upon his counsel's initial omission.  The harsh effect of Petitioner's sentence is that the state court ordered his sentences for his rape convictions to be consecutive. Blakely does not apply to consecutive sentencing, Oregon v. Ice, 555 U.S. 160, 163-64 (2009) ( neither Apprendi v. New Jersey, 530 U.S. 466 (2000) nor Blakely applies and the Sixth Amendment did not prohibit of Oregon from choosing to assign to judges, rather than to juries, the finding of facts necessary to impose consecutive, rather than concurrent, sentences for multiple offenses). The Tennessee trial court

has the discretion to impose consecutive sentences upon a finding of statutorily described facts. See Tenn. Code Ann. § 40-35-115.

For these collective reasons, the Court concludes that this claim about his counsel's failure to assert a Blakely claim lacks merit. The merits of the Blakely claim is discussed infra.

### g. The Plea Offer Claim

Petitioner's final ineffective assistance of counsel claim is that:

> Trial counsel failed to properly advise Petitioner regarding the plea offer extended by the State. Specifically, counsel failed to adequately explain Petitioner's comparative sentencing exposure with and without a jury finding that he employed force and was thus guilty of rape, failed to explain the near certainty of conviction on the sexual battery by an authority figure and statutory rape counts, failed to explain that Petitioner's sentencing exposure on the sexual battery and statutory rape counts alone well exceeded the prosecution's plea bargain offer, and/or failed to properly advise Petitioner on whether to accept the prosecution's plea offer of less than 10 years."

(Docket Entry No. 42, Second Amended petition at 10).

For this claim, this Court must apply Supreme Court holdings, "as of the time of the relevant state-court decision." Williams.529 U.S. at 412. As stated earlier, Missouri v. Frye, —— U.S. ——, 132 S.Ct. 1399 (2012), and Lafler v. Cooper, —— U.S. ——, 132 S.Ct. 1376 (2012) support this claim (assuming any factual merit to this claim). Yet, the Sixth Circuit observed: "as held by every other circuit to consider the issue, neither Frye nor Cooper created a 'new rule of constitutional law' made retroactive to cases on collateral review by the Supreme Court." In re Liddell, 722 F.3d 737, 738 (6th Cir. 2013). For the reasons stated earlier, the Court concludes tha that under Liddel, this claim cannot be considered as a matter of law. In addition, for the reasons stated earlier this claim is also time barred

### h. The Amended Indictment

Petitioner's next claim is that his constitutional rights were violated when the trial court allowed the State to amend the indictment before trial. (Docket Entry No. 42, Seconded Amended petition at 11-12). The Tennessee Court of Criminal Appeals addressed this issue on direct appeal and found the claims to be meritless. "Defendant was not surprised or prejudiced by the amendment to the indictment, which was consistent with the State's bill of particulars. Accordingly, no substantial rights of Defendant were prejudiced." Fults, 2006 WL 1896356 at *10.

Petitioner does not cite any United States Supreme Court holding for this claim nor evidence or law that the state courts' judgment is contrary to clearly established federal law. This claim is without merit.

### i. Excessive and Discriminatory Sentence

,Petitioner's next claim is that his forty-five-year sentence is excessive and disproportionate to his offenses in violation of the Eighth Amendment. (Docket Entry No. 42 at 13). Petitioner also presents an equal protection and due process claims citing, "[f]emale teachers who commit comparable offenses with their male students of a comparable age typically face less serious charges and receive much lower sentences." Id.

The undisputed facts are that Petitioner's rape convictions has a sentencing range of eight (8) to 12 years. Petitioner's nine (9) years is just above the minimum eight (8) years and three (3) years below the maximum of 12 years. The Tennessee Court of Criminal Appeals addressed this issue and did not find a violation of clearly established federal law:

> The petitioner also argues that his sentence was "grossly disproportionate" to the point that it constitutes cruel and unusual punishment. The petitioner's entire

argument consists of one paragraph:

> There is no question from the Governor's Task Report Force
> Report introduced by the Petitioner as part of this petition that the
> average incarceration length for [Class B] felony standard
> offenders was 108.5 months and for rape of a child, a more serious
> offense in the instant offenses was 230.4 months. The Petitioner
> received a grossly disproportionate sentence of 45 years. That
> sentence, therefore, constitutes cruel and unusual punishment
> under the Eighth Amendment to the United States Constitution and
> Article One, Section Sixteen of the Tennessee Constitution. Solem
> v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637.

**First, we note that the petitioner's citation to Solem v. Helm is not pertinent
to the case at hand. In Solem, the defendant was given a life sentence without
the possibility of parole for a bad check felony conviction. The conviction
was his seventh felony; however, his prior convictions were for "nonviolent,
minor crimes" and the life sentence was found to be disproportionate to the
conviction. Here, the defendant's sentence of forty-five years was for
repeated sexual offenses committed against the victim over a period of
eighteen months,** which cannot be contrasted with passing a bad check for $100.
The petitioner's argument is merely a conclusion and does not satisfy his burden
of proof. Therefore, he is not entitled to relief on this issue.

In his next issue, the petitioner argues that he was denied equal protection because
he received a much greater sentence than female teachers have received for having
sex with their students. His argument to this issue entirely consists of the
following: "Trial counsel admitted on cross examination that female teachers have
received far less sentences than the sentence the Petitioner received thereby
denying his right to equal protection." His argument contains no citation to
authority and no support for his argument. This issue is waived as the petitioner
has failed to cite authority to support his argument. Tenn. Ct.Crim.App. R. 10(b);
State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App.1997).

Fults, 2009 WL 311461, at *6 (emphasis added).

In the state courts, Petitioner did not present proof to identify female teachers who

committed comparable offenses with their comparable male or female students of a comparable

age for a comparable period of time. The Court concludes that the Tennessee appellate court

reasonably applied Solem to the facts of Petitioner's conduct. Thus, this claim was reasonably

decided by the state courts.

### j. **Blakely** Claims

Petitioner's <u>Blakely</u> claim is that "[t]he trial court - and not the jury - made the findings of fact necessary under state law to support sentencing Petitioner above the low end of the range on some counts and consecutively on some counts." (Docket Entry No. 42 at 15).

Petitioner was convicted of 5 counts of rape, 12 counts of sexual battery by an authority figure, and 7 counts of statutory rape. <u>Fults</u>, 2009 WL 311461, at *1. The sentencing range was 8 to 12 years on the rape counts, 2 to 4 years on the sexual battery by an authority figure counts and 1 to 2 years on the statutory rape counts. (Docket Entry No. 10-9 at 154). The trial court sentenced Petitioner to 9 years on each rape count, running the 5 counts consecutively, and to 3 years on each sexual battery by an authority figure count, also running the 12 counts consecutively. <u>Id.</u> at 157, 160. With each offense running concurrently with one another, Petitioner was sentenced to an effective sentence of 45 years. <u>Id.</u> at 160.

Under Tennessee law, "[a]bsent enhancing or mitigating factors, the presumptive sentence for a Class B, C. D, and E felonies was the minimum in the applicable range" <u>Gomez II</u>, 239 S.W.3d at 739; trenn. Code Ann. §40-35-210(c). As applied here, Petitioner's qualifying felonies yielded a sentencing range of 8 to 12 years. The state trial court raised Petitioner's sentence to one year beyond the minimum sentence to Petitioner's sentence for each rape conviction based upon four enhancement factors in Tenn. Code Ann. § 40–35–114(5), (8), (16), (18) (2003) that:

> (5) A victim of the offense was particularly vulnerable because of age or physical or mental disability . . .;        . . .

33

(8) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement;. . .

(16) The defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense;. . .

(18) The defendant committed the offense while on school property[.]

(Docket Entry No. 10-9 at 155-56).

Petitioner did not have a prior criminal history. Id. at 156. As to mitigating factors, the trial court also considered a plethora of letters stating that "you are a fine person, that you help in your school, that you take care of your parents, that you work in your church, "the principal's testimony as to Petitioner being a good teacher, that Petitioner comes from a good family and has a good work history. Id. at 156-57. Yet, the trial court sentenced Petitioner to 9 nine years on each of the 5 rape convictions that were ordered to be served consecutively given the abuse of Petitioner's position of trust with an emotionally vunerable student for an eighteen month period. In his post-conviction appeal, the Tennessee Court of Criminal Appeals held that "because Blakely and its progeny do not affect consecutive sentencing, we conclude that the petitioner is not entitled to any relief on this issue." Fults, 2009 WL 311461, at *5.

Here, although the state court imposed a consecutive sentence, the state trial court heard proof at a sentencing hearing and  increased Petitioner's sentence one year beyond the presumptive sentence of eight year on each of his rape convictions. This Court concludes that, Blakely and Cunningham apply to the one year enhancement of Petitioner's otherwise minimum sentence. Yet, "Blakely is . . . "amenable to a harmless-error analysis." Allen v. Parker, -- Fed.Appx--, 2013 WL 4712735, at *7 (6th Cir. Sept. 3, 2013) (citations omitted). In Allen, the

34

Sixth Circuit considered the claim for an enhanced sentence, based upon the state trial court's findings for statutory enhancements under the Tennessee Criminal Sentencing Reform Act. There, the Sixth Circuit found the sentencing enhancement harmless:

> Unlike Ohio, Tennessee's sentencing statute has remained mostly the same. Though judges are no longer required to do so, the statute still recommends that sentencing judges consider the same basic list of enhancing and mitigating factors. The only major difference is that the mandatary threshold finding required by the pre- Cunningham version of the statute has been eliminated to give a court complete discretion at the beginning of its analysis. Allen has provided us with no reason to doubt that a sentence imposed under the post- Cunningham statute would be similar in all material respects to the sentence he is presently serving. Habeas relief would be fruitless and therefore inappropriate.

Id. at *10 (footnote omitted).

Based upon the record, the Court concludes that Petitioner clearly occupied a position of trust as a teacher. By his repeated sexual acts, petitioner abused the minor victim who had mental health issues and did so for a period of eighteen months. Many of the facts that were used to enhance the petitioner by one year were already in evidence before the jury and were necessary factual predicates for the jury's verdict. Thus, the clear majority of the facts that the state court cited to enhance Petitioner's sentences by one year above the minimum sentence, were found by the jury. The harshness of Petitioner's sentence is due to the consecutive sentences for the nine rape convictions that the Tennessee appellate court correctly ruled did not present a Blakely claim. In this factual context, the Court deems any Blakely violation to be harmless.

### k. Prosecutorial Misconduct Claim

Petitioner exhausted prosecutorial misconduct claims concerns the defense's subpoena of the victim's family's telephone records. For this claim, Petitioner alleges:

Prior to trial, defense counsel served a subpoena on Linda Devine for her phone

records. Through these records, counsel aimed to show that: (a) Ms. Devine and/or her son made repeated calls to Petitioner both before and after criminal charges were filed; (b) the Devines' frequent contact with Petitioner demonstrated that neither mother nor son was fearful of him; and (c) their post-indictment contact corroborated the defense theory that Ms. Devine and/or her son were trying to extort money from Petitioner.

The prosecution informed Ms. Devine that she did not have to honor the defense subpoena for her phone records. Accordingly, Ms. Devine came to court and did not turn over to defense counsel phone records she had in her possession.

(Docket Entry No. 42, Second Amended Petition at 14).

As to the State prosecutor's withholding or encouraging the withholding of the victim's mother's telephone records, the state trial record reveals that on the first day of trial, Linda Devine, the victim's mother appeared and the trial court questioned her about the defense subpoena for her telephone records:

Q.    BY THE COURT: Ms. Blaylock, if you will pass that to her, please. Ma'am, I'm handing you a copy of a subpoena. I want you to take a look at that. Have you ever been served with that document?

A.    Yes, sir.

Q.    Okay. How long ago were you served with it?

A.    I don't know.

THE COURT: Okay. If you'll get that back for me, Ms. Blaylock. We'll make that Offer of Proof Number 1, please. I'll need that back. I'm going to ask her a couple of questions.

Q. BY THE COURT: On here it says - it asks for you to - it says it was issued on October 1st.

A.    Okay.

Q.    Does that sound right?

A.    (No verbal response).

36

Q.     It says that they want you to supply bills for telephone service from July, 2001 through June, 2003. This includes home phone, cell phone, and long distance. Did you read that?

A.     Yes, sir.

Q.     Okay. When you were served with this document on October 1st, 2003, did you have this - did you have these various things, these records?

A.     No, sir.

Q.     Did you make any effort? Did you look through the house or try to find any of that?

A. Yes, sir, I did. Yes, sir, I did

**Q. And you don't have any of these records?**

**A. No, sir.**

(Docket Entry No. 10-4 at 170-171) (emphasis added). In his motion for new trial, Petitioner

asserted that: "The court erred in allowing Linda D[e]vine to testify after she failed to respond to

Defendant's Subpoena Duces Tecum for telephone records." (Docket Entry No. 10-3 at 93).

At the hearing on the motion for new trial, the trial court and Petitioner's counsel had the

following colloquoy:

MR. DOTSON: Yes, sir. And then the last basis was that the Court erred in allowing Linda Devine to testify at the trial of the case after she was not in compliance with the subpoena that we -

THE COURT: That was the telephone records?

MR.DOTSON: Yes, sir. And that she -

THE COURT: But she said she didn't have them.

MR. DOTSON: She did not notify anybody of that until she testified.

THE COURT: Is she required to do that? On a subpoena duces tecum, if you

subpoena somebody and they don't have it, and then they come to court and they go I don't have them, then you are saying - are they required to notify you they don't have them?

MR. DOTSON: Generally I would say no, Judge. However, in this case when she could have with reasonable effort gotten them. And if she notified the State of Tennessee that she did not have them and did not want to get them, and they told her that it was okay, that she didn't have to. But we would submit to the Court that we should have been placed on notice that that was going to occur prior to the trial of the case.

(Docket Entry No. 10-11 at 7-8). Petitioner did not pursue this claim on his post conviction

appeal' (Docket Entry No. 10-24, Petitioner's Post Conviction Appeal Brief at 5)

In any event, prosecutorial misconduct must be so egregious as to deny petitioner a

fundamentally fair trial before habeas corpus relief becomes available as a violation of the

defendant's right to due process. Caldwell v. Mississippi, 472 U.S. 320, 335-36 (1985). The

harmless error standard applies to claims of prosecutorial misconduct. Johnson v. Burke, 903

F.2d 1056, 1062 (6th Cir. 1990), overruled on other ground in Couch v.Jabe, 951 F.2d 94 (6th

Cir. 1991). Here, the Court concludes that given the trial record, this claim lacks a factual basis

and is without merit

### 2. Defaulted Claims

Respondent contends that many of the Petitioner's claims in this action are procedurally

defaulted for his failure to present these claims or submit any proof or raise a claim on direct or post

conviction appeal. Procedural Default Doctrine is an extension of the comity policy that underscores

the exhaustion doctrine and bars consideration of a federal claim in a habeas action that was barred

by application of a state rule absent a showing of cause and prejudice. Coleman v. Thompson, 501

U.S.722, 750 (1992). The rationale for this doctrine arises out of federal respect for federalism and

maintaining comity with state courts. Id. at 730-32. The Supreme Court further recognized that state procedural rules also serve a legitimate state interest in finality of criminal convictions. Francis v. Henderson, 425 U.S. 536, 542 (1976). State procedural rules channel the controversy to the state trial and appellate courts and serve the State's interest in finality. Id. at 490-9.

The procedural default doctrine applies only to firmly established and "regularly followed" state procedural rules. Johnson v. Mississippi, 486 U.S. 578, 587 (1988). If the state court did not determine whether a petitioner's claims were procedurally defaulted under state law, then the District Court is to consider whether the state court would bar the claims, if those claims were presented to the state courts. Engle, 456 U.S. at 125-26, n.26. If the state decision is unclear, then the same rule obtains and the Court examines the briefs of the parties in the state courts. Raper v. Mintzes, 706 F.2d 161, 164 (6th Cir.1983).

Once procedural default on a state rule is established, the federal petitioner must establish cause and prejudice to excuse such non-compliance. Carrier, 477 U.S. at 488. The procedural default doctrine also does not preclude federal habeas review if the petitioner has an error-free trial, but makes a showing of actual innocence of the offense with clear and convincing evidence that reveals a fundamental miscarriage of justice. Sawyer v. Whitley, 505 U.S. 333, 336 (1992). If a petitioner's claims are procedurally barred, the habeas petitioner must show "cause for the noncompliance" and "actual prejudice resulting from the alleged constitutional violation." Wainwright v. Sykes, 433 U.S. 72, 84 (1977). Procedural default may also be excused "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496. In the Sixth Circuit, the analysis under the procedural default doctrine was set forth by the Court of Appeals in the oft-cited Maupin v. Smith, 785 F.2d 135, 138 (6th Cir.

1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.

> \*   \*   \*

> Second, the court must decide whether the state courts actually enforced the state procedural sanction.

> \*   \*   \*

> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

Id. at 138 (citations omitted).

Thus, under Tenn. Code Ann. § 40-30-106(g), these claims are deemed waived. Under that statute, "[a] ground for relief [in] in a post-conviction proceeding] is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction," as here, on appeal from the judgment of the trial court. Tenn. Code Ann. § 40-30-106(g). The Sixth Circuit found that the Tennessee waiver statute, Tenn. Code Ann. § 40-30-106(g), to be an independent and adequate state rule that is regularly enforced. Cone v. Bell, 243 F.3d 961, 969 (6th Cir. 2001), overruled on other grounds by Bell v. Cone, 535 U.S. 685 (2002)).

To show cause, Petitioner must show that some objective factor impeded his counsel's compliance with the State's procedural rule. Id. at 488. Objective factors include interference by

public officials, ineffective assistance of counsel, of unavailability of factual or legal basis for a claim. Id. Where a Petitioner "makes no argument that this procedural default should be excused, under either the cause-and-prejudice or miscarriage of justice exceptions" these claims shall be dismissed. Rayner v. Mills, 685 F.3d 631, 644 (6th Cir. 2012).

### a. Defaulted Claims about Counsel

As to Petitioner's defaulted claims as to trial counsel, Respondent cites the following claims in the amended petition:

> the state trial court found that: "[the Petitioner] offered no proof in regard to counsel's failure . . . to produce a statement about the signing of a car title to the victim[.]" Id. at 28. Petitioner did not present this claim on his post conviction appeal.

> Petitioner's next defaulted claims are that "[t]rial counsel failed to adequately investigate, or present testimony from[] impeachment witnesses such as Barclay Hutton, who could have testified about the alleged victim's dishonesty and manipulative behavior." (Docket Entry No. 42 at 8). At the post-conviction hearing, Petitioner did not present any evidence nor raised this claim on appeal (Docket Entry No. 10-22, -24). Petitioner does not address this claim in his response to Respondent's motion to dismiss.

> Petitioner's related claim is that "[t]rial counsel failed to inquire adequately into the results of the investigation conducted by Harold Pendegraph, a private investigator hired by Petitioner's family. Trial counsel likewise failed to call Pendegraph as a witness at trial, or introduce any of the witnesses or evidence uncovered by Pendegraph." (Docket Entry No. 42 at 9). The state post-conviction record lacks any proof of the private investigator's activities or report.

> Petitioner's next claim is that "[t]rial counsel failed to move for a change of venue despite extensive pre-trial publicity." (Docket Entry No. 42 at 10). The trial court found the lack of any proof on this claim. (Docket Entry No. 10-21 at 28). Petitioner failed to raise this claim in his appeal (Docket Entry No. 10-24) nor does he address this claim in his response to Respondent's motion to dismiss.

See Docket Entry No. 46, Respondent's Memorandum at 12-13, 15-16 and 25-27).

Upon review of the state record and the record in this action, the Court concludes that these claims are procedurally defaulted for Petitioner's failure to present these claims on direct or post

41

conviction appeal. The Court also finds the lack of any showing of cause or prejudice to excuse them. Absent evidence or applicable law, the Court concludes that these claims are procedurally defaulted and cannot afford a basis for federal habeas relief. Sandridge, 385 F.3d at 1035

### b. **Brady** Claims

Petitioner's Brady claims are that the State failed to disclose the following: (1) the victim's school disciplinary records prior to trial, (2) the victim's and his family's civil action and application for compensation under Tennessee law; and (3) the State's discouraging the victim's mother from complying with a subpoena for her telephone records on the victim's telephone calls to Petitioner before and after the filing of criminal charges. (Docket Entry No. 42, Second Amended Petition at 11).

The State has a constitutional obligation to furnish an accused with exculpatory evidence pertaining to the accused's guilt or innocence or to the potential punishment he faces. Brady v. Maryland, 373 U.S. 83, 87-88 (1963). The Brady doctrine encompasses impeachment material. Giglio v. United States, 405 U.S. 150, 153-55 (1972). For a Brady claim, Petitioner must make some showing that proves that the State suppressed evidence. United States v. Warshak, 631 F.3d 266, 300 (6th Cir. 2010). Petitioner must prove "(1) that the evidence was favorable to him, (2) that it was suppressed (whether intentionally or not) by the government, and (3) that prejudice ensued." Jamison v. Collins, 291 F.3d 380, 385 (6th Cir. 2002). As to the merits of this Brady claim, the Sixth Circuit reiterated the evidentiary requirements to obtain any habeas relief:

> Brady requires the prosecution to disclose exculpatory and impeachment evidence that is material either to guilt or to punishment. The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A Brady violation has three elements: (1) the evidence must be favorable to the accused, either because it is exculpatory, or because it is

impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued.

Jalowiec v. Bradshaw, 657 F.3d 293, 302–03 (6th Cir. 2011) (quoting Beuke v. Houk, 537 F.3d 618, 633 (6th Cir.2008) (internal quotation marks and citations omitted)). Yet, "Brady does not apply when the defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information.'" Owens v. Guida, 549 F.3d 399, 417 (6th Cir. 2008) (quoting Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998)). Brady material involving ineffective assistance of trial counsel may excuse a procedural default and render a habeas claim timely under Section 2244(d)(1)(D). Banks v. Dretke,, 540 U.S.668, 692-98 (2004).

Neither the petition for post conviction relief nor transcript of the post-conviction hearing reveal any argument or discussion of the State's failure to disclose any of this evidence. (Docket Entry No. 10-22). Petitioner failed to raise this claim in the state courts. Under Tenn. Ct. Crim. App. R. 10(b), "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record" are deemed to be waived   Although a Brady violation may excuse a procedural default, the state record does not reflect that the State had the information that Petitioner asserts was withheld. As reflected in this Court's earlier discussion, both Petitioner and his counsel were aware of the victim's school disciplinary records prior to trial. Given the defense counsel's decision to pursue the consent defense, the Court concludes for the reasons stated in the related ineffective assistance of counsel claim that this information about disciplinary records would not be material to qualify as a Brady claim. Likewise, there is not any proof that the victim's civil or administrative action was filed prior to Petitioner's trial. The Court concludes that these claims do not qualify as Brady claims so as to excuse the procedural default.

As to the State prosecutor discouraging the victim's mother from producing her telephone records, these records were expected to prove the victim's contacts with Petitioner. At the post-conviction hearing, Petitioner described the trial transcript as incomplete citing the absence of the district attorney's admission that she told the victim's mother not to answer the subpoena for her telephone bills records. (Docket Entry No. 10-22 at 7-9). The post-conviction court denied this claim (Docket Entry No. 10-21 at 27, 29) and Petitioner did not include this claim on his post conviction appeal. (Docket Entry No. 10-24). In any event, the Court earlier quoted the trial record reflecting discussions of the issue at the beginning of Petitioner's trial and the hearing on his motion for a new trial. Supra at 32-33. Petitioner abandoned this claim on appeal in the state courts and Petitioner's claim is defaulted. The Court does not discern a basis for a Brady violation for withholding of records that the victim's mother stated that she did not have. There is also not any proof of any false testimony by the victim's mother. This claim is defaulted and there is not any showing to excuse that default

### c. Prosecutorial Misconduct Claim

Petitioner's next claim is that the prosecutor made improper statements in closing argument. (Docket Entry No. 42 at 14). In his petition for post-conviction relief, Petitioner asserted that "Assistant District Attorney Laural Nutt committed prosecutorial misconduct in her remarks to the jury that Mr. Fults was a Christian man and how he taught Sunday School and then ridiculing homosexuality, saying that you couldn't be homosexual and be a Christian." (Docket Entry No. 10-21 at 13). In the post-conviction proceedings, Petitioner withdrew that claim:

> MR. TRANT: And, Your Honor, if I may, we are on the second page of the allegations in support of the petition. On Page 10 the fourth paragraph starting with Assistant Attorney General Laural Nutt complaint. We are withdrawing that

paragraph.

(Docket Entry No. 10-22 at 15). Petitioner did not raise the issue in his appellate brief. (Docket Entry No. 10-24). Tenn. Ct. Crim. App. R. 10(b) states: "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." The Court concludes this claims is procedurally defaulted and there is not any showing to excuse this default.

### D. Conclusion

Accordingly, for these reasons, the Court concludes that the Respondent's motion to dismiss (Docket Entry No. 45) should be granted and the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _27th_ day of March, 2014.

William J. Haynes, Jr.
Chief United States District Judge